NEVADA POWER COMPANY, a Nevada Corporation, Appellant, v. RAYMOND HAGGERTY, DIANE HAGGERTY, and HORSESHOE CLUB OPERATING COMPANY, a Nevada Corporation, dba HORSESHOE CLUB & CASINO, Respondents.

No. 31335

December 13, 1999                    989 P.2d 870

*Cohen, Johnson, Day & Clayson* and *Dianna O. DeBeau,* Las Vegas; *Stephen F. Smith,* Associate General Counsel, Nevada Power Company, Las Vegas, for Appellant.

*Crockett & Myers* and *James V. LaVelle,* Las Vegas, for Respondents Haggerty.

*Moran & Associates* and *Lew Brandon* and *Jill M. Lynne,* Las Vegas, for Respondent Horseshoe Club.

*Smith & Kotchka,* Las Vegas, for Amicus Curiae Nevada Self-Insurers Association.

## OPINION

By the Court, BECKER, J.:

Raymond Haggerty (Haggerty), an employee of the Horseshoe Club Operating Company (Horseshoe), suffered injuries by electrical shock when he came into contact with a power line. The Horseshoe paid full workers' compensation coverage to Haggerty. Haggerty then filed a negligence lawsuit against Nevada Power Company (Nevada Power). Nevada Power filed a third-party complaint against the Horseshoe, seeking indemnification and contribution.[1]

The Horseshoe moved to dismiss the third-party complaint on the ground that, once an employer has paid workers' compensation coverage, the exclusive remedy/immunity provisions of the workers' compensation scheme protect an employer from further liability. Nevada Power argued that the Horseshoe owed an independent duty to Nevada Power under Nevada's overhead power line statutes, NRS 455.200-NRS 455.250, and thus was not shielded from liability under workers' compensation law.

The district court granted the Horseshoe's motion to dismiss, finding that the power line statutes did not create an exception to employer immunity provided under workers' compensation laws. The dismissal was certified pursuant to NRCP 54(b).[2]

Amicus Curiae Nevada Self-Insurers Association (Association) argues that the provisions of the overhead power line statutes do not apply to high voltage transformers located inside a building.

We conclude that the overhead power line statutes do create an independent duty to indemnify in favor of a utility and constitute an exception to the employer immunity provisions of the workers' compensation laws. However, we also conclude that the electrical equipment which caused Haggerty's injuries does not fall within the definition of an overhead power line and affirm the district court's dismissal of the third-party complaint.

### FACTS

Haggerty was employed by respondent Horseshoe as a mainte-

---

[1]The third-party complaint contained causes of action for implied and statutory indemnification, contribution and negligence. As to negligence, Nevada Power alleged that the Horseshoe removed warning signs or a lock installed by Nevada Power and that the removal of the signs or lock was a proximate cause of Haggerty's injuries.

[2]The district court dismissed all of the third-party complaint, not just the portion that dealt with statutory indemnification pursuant to the power line

nance engineer. In the course of his employment, Haggerty entered a room located in the basement of the Horseshoe containing electrical equipment. Within the room was a vault,[3] normally secured by a padlock, where high voltage transformer equipment owned by appellant Nevada Power was located. The transformers were set on a platform rising from the finished floor of the vault. Haggerty went into the vault, which had been left unlocked, while conducting an inspection.

Once inside the vault, Haggerty noticed a vent that needed cleaning. The vent was located next to an electrical bus bar that ran along the top of some high voltage transformers. When Haggerty climbed a ladder to reach the vent, his shoulder touched wires relating to the bus bar. Haggerty suffered electrical shock and various injuries. Prior to the accident, Nevada Power was not informed by the Horseshoe that Haggerty would be working in close proximity to the high voltage equipment. Nevada Power was aware of the fact that authorized Horseshoe personnel would have access to the electrical room where the vault was located.

Haggerty applied for and received workers' compensation coverage under the Nevada Industrial Insurance Act (NIIA). Pursuant to the NIIA, Haggerty cannot pursue litigation against the Horseshoe.

Haggerty filed suit against Nevada Power on a negligence theory. Nevada Power filed a third-party complaint against the Horseshoe seeking indemnification and/or contribution from the Horseshoe pursuant to NRS 455.200-NRS 455.250. These statutes require a person to notify a public utility company before conducting any work in the vicinity of high voltage overhead power lines. The statutes also provide remedies for the utility company, against any person responsible for complying with the statutes, for injuries to persons or property caused by a failure to abide by the statutes.

The Horseshoe filed a motion pursuant to NRCP 12(b)(5) to dismiss Nevada Power's third-party complaint. The Horseshoe argued that it was immune from further liability since it had paid full workers' compensation coverage to Haggerty. The district court agreed and granted the motion to dismiss.

---

statutes. However, the pleading did not allege that Horseshoe's conduct in removing signs or locks gave rise to an independent duty which would exempt those claims from the immunity provisions of the workers' compensation statutes. Therefore the district court dismissed all of Nevada Power's claims against the Horseshoe.

[3]The term "vault," as used by the parties, is a technical term referring to the segregated area where the high voltage equipment was located.

## DISCUSSION

### I. *Standard of Review*

In reviewing orders granting motions to dismiss, this court considers whether the challenged pleading sets forth allegations sufficient to establish the elements of a right to relief. Pemberton v. Farmers Ins. Exchange, 109 Nev. 789, 792, 858 P.2d 380, 381 (1993). In making its determination, this court is to accept all factual allegations in the complaint as true. *Id.* at 792, 858 P.2d at 381 (citing Marcoz v. Summa Corporation, 106 Nev. 737, 739, 801 P.2d 1346, 1347 (1990)).

Given the complaint, the resolution of conflicts between the two statutes is an issue of law which can be resolved through the vehicle of a motion to dismiss.

This case presents two issues of first impression:

> 1. Do the liability provisions of NRS 455.240 impose an independent duty upon an employer who causes an employee to come into contact with a high voltage line in violation of the statute, thus negating the employer's immunity from suit under NRS 616B.616(3)?
>
> 2. Does the definition of "overhead line" contained in NRS 455.200 encompass electrical equipment located within a building?

### II. *Independent Duty Doctrine*

Many states have enacted high voltage safety acts designed to decrease the number of injuries suffered by people, particularly workers, as a result of accidental contact with high voltage electrical equipment. These statutes require persons to contact the local utility company before working near certain types of high voltage electrical systems. The utility company can then ensure that the work is performed in a safe manner, without damage to persons or property.

To encourage compliance with the statutes, legislatures have included penalty and liability provisions in these acts. Violators are subject to both a civil fine for non-compliance and liability to the utility for damage to the utility's property or the person or property of third persons damaged by contact with high voltage lines. Nevada's version of these types of statutes is set forth at NRS 455.200 through NRS 455.250.[4]

---

[4]These acts do not apply to electrical lines that are buried in subsurface installations. Subsurface installations are covered by NRS 455.080–NRS 455.180. While violation of the subsurface installation rules can result in a civil fine, those statutes do not include a private remedy provision similar to NRS 455.240.

Pursuant to NRS 455.220, if a person can reasonably foresee that he or she, or any part of a tool or material used by him or her, is likely to come within a certain distance of "an overhead line carrying high voltage," the person cannot proceed without complying with the notice and consent provisions of NRS 455.230. NRS 455.230 provides for notice to the applicable utility company and consent to the work by the utility company. The utility company may also direct how the work is to be performed and charge a fee for any services rendered by the company to ensure the work is performed in a safe manner.

If a person violates a provision of the act, and the violation results in contact with an overhead line, then that person is responsible for damages caused by the contact. Specifically, NRS 455.240 provides:

> If an act constituting a violation of any provision of this chapter causes contact with an overhead line carrying high voltage, each person who committed the violation or caused another person to commit the violation shall pay the public utility operating the overhead line carrying high voltage for:
> 1. All damages to property of the public utility;
> 2. All reasonable costs and expenses incurred by the public utility as a result of the contact; and
> *3. The costs and expenses incurred by the public utility as a result of the contact for damages to third persons.*
> Each person who committed a violation causing the contact or who caused another person to commit a violation causing the contact is jointly and severally liable for the payment required by this section.

(Emphasis added.)

Nevada Power argues that, whenever a power company is sued as a result of harmful contact with high voltage electrical equipment, NRS 455.240(3) permits the utility to file a third-party indemnification action against the person who permitted the contact in violation of NRS 455.220 and NRS 455.230. Moreover, since the statute refers to "a person," Nevada Power contends that an employer who violates the statute, resulting in harm to an employee, is subject to a third-party action when the employee sues the utility.

In contrast, the Horseshoe argues that it is immune from liability under NRS 455.240 because NRS 616B.612 (formerly NRS 616.270) grants immunity to an employer who has provided workers' compensation coverage to an injured employee. That statute provides, in relevant part:

> 1. Every employer within the provisions of chapters 616A to 616D, inclusive, or 617 of NRS, and those employ-

ers who shall accept the terms of those chapters and be governed by their provisions, as in those chapters provided, shall provide and secure compensation according to the terms, conditions and provisions of those chapters for any and all personal injuries by accident sustained by an employee arising out of and in the course of employment.

. . . .

4. In such cases the employer shall be relieved from other liability for recovery of damages or other compensation for such personal injury, unless by the terms of chapters 616A to 616D, inclusive, of NRS otherwise provided.

NRS 616B.612 (formerly NRS 616.270).[5]

■■■■■■■■

As a general rule, an employer who provides compensation to an injured employee under the NIIA is insulated from further liability to that employee. Oliver v. Barrick Goldstrike Mines, 111 Nev. 1338, 1342, 905 P.2d 168, 171 (1995). Similarly, absent an express indemnification agreement or an independent duty between the employer and the third party, an employer will not be liable to a third party for indemnification arising out of an injury to an employee. American Federal Savings v. Washoe County, 106 Nev. 869, 877-78, 802 P.2d 1270, 1275 (1990) (employer not immune under the NIIA when express contract requires employer to indemnify a third party for compensation paid by the third party to the employer's employee); Outboard Marine Corp. v. Schupbach, 93 Nev. 158, 164-65, 561 P.2d 450, 454 (1977) (independent duty owed by employer to third party can result in implied indemnity, but no independent duty when employer purchased a defective product from third-party manufacturer); *see also* 7 *Larson's Workers' Compensation Law,* § 76.40 at 14-819 & § 76.50 at 14-857 (1998) (recognizing that third-party indemnity from employer can be based on an express contract or on a separate legal duty).

■■■■■■■

Nevada Power argues that the overhead power line statutes, NRS 455.200-NRS 455.250, create an independent statutory duty. Thus, according to Nevada Power, an exception to the rule of

---

[5]There is no significant difference between NRS 616.270 and NRS 616B.612. NRS 616B.612 states that the workers' compensation statutes are found in "chapters 616A to 616D, inclusive, or 617." NRS 616.270 states that the workers' compensation statutes are found in "this chapter." We have therefore chosen to refer to the current version of the statute, rather than the version which existed at the time of the injury.

employer immunity was created by the passage of these acts.[6] The Horseshoe submits that the remedies provided by NRS 455.240 do not address the issue of employer immunity and that the legislature did not intend to create an exception when it enacted the overhead power line statutes.

While this is an issue of first impression in Nevada, the identical issue has been resolved in the courts of several other states. Four out of the five states that have addressed this issue concluded that overhead power line statutes allow a power company to seek indemnification from an employer, despite the employer's general immunity under workers' compensation law. Each state has overhead power line statutes which provide that an employer can be held liable to a power company under essentially the same conditions as found in Nevada's overhead power line statutes. Each of these states also has an exclusivity provision in its workers' compensation statutes, which is essentially identical to NRS 616B.612.

Texas was the first state to hold that its overhead power line statutes could provide a power company with an indemnity action despite the exclusivity provision of a workers' compensation law. *Olson v. Central Power and Light Co.*, 803 S.W.2d 808, 812 (Tex. Ct. App. 1991); Houston Lighting, Etc. v. Eller Outdoor Adv., 635 S.W.2d 133, 135 (Tex. Ct. App. 1982). The *Houston Lighting* court held that an indemnity action is based on a breach of an employer's statutory duty under Texas' overhead power line statutes and does not arise on account of the employee's injury. The court stated that its reasoning was consistent with the legislative intent to protect workers who perform duties in close proximity to overhead power lines. *Houston Lighting,* 635 S.W.2d at 135.[7] The *Olson* court agreed with *Houston Lighting* and further noted that the overhead power line statutes, being a later and more specific set of statutes, should take precedence over the general workers' compensation statutes. *Olson,* 803 S.W.2d at 812.

Arizona courts have also held that an employer can be required

---

[6]The Horseshoe makes a lengthy argument that an independent duty cannot be created by an implied indemnity contract, citing to NRS 616B.609 (formerly NRS 616.265). However, this court has held that implied indemnity can arise pursuant to an independent duty, despite NRS 616.265. *Outboard Marine,* 93 Nev. at 164-65, 561 P.2d at 454.

[7]The Horseshoe argues that *Houston Lighting* was distinguished in Westchester Fire Ins. v. American General, 790 S.W.2d 816, 818 (Tex. Ct. App. 1990). *Westchester* concerned an interpretation of an insurance policy. One party cited to *Houston Lighting*. The *Westchester* court merely noted that *Houston Lighting* was "inapposite in construing a policy exclusion." *Id.* Thus, the holding of *Houston Lighting* was not modified in any way by *Westchester*.

to indemnify a power company despite employer immunity under workers' compensation law. Tucson Elec. v. Dooley-Jones and Assoc., 746 P.2d 510, 514 (Ariz. Ct. App. 1987); Tucson Elec. v. Swengel-Robbins Const., 737 P.2d 1385, 1388 (Ariz. Ct. App. 1987).

The *Swengel-Robbins* court reasoned that the workers' compensation statutes limit the employee's ability to sue his or her employer, but do not limit the employer's liability based on a legal relationship with a third party, *i.e.*, the power company. *Swengel-Robbins*, 737 P.2d at 1388. The court also recognized that to bar an indemnity action would frustrate the legislative intent to hold an employer liable for violations of the overhead power line statutes. *Id.*[8]

Oklahoma reached the same result in Travelers Insurance v. L.V. French Truck Service, 770 P.2d 551, 554 (Okla. 1988). The court noted that a third party's right to indemnity must arise out of an independent legal relationship between the employer and the third party. The court then concluded that Oklahoma's overhead power line statutes created such an independent relationship. The court stated that "the gravamen of Traveler's claim is enforcement of a statutorily-created duty which is imposed without regard to whether any other kind of obligation may result from the violation, *i.e.*, responsibility to pay compensation for an employee's on-the-job injury." *Id.*

The most recent case to allow indemnification, decided by the Supreme Court of Georgia, is Flint Electric Membership v. Ed Smith Construction, 511 S.E.2d 160 (Ga. 1999). The court concluded that the indemnification action was based on Georgia's overhead power line statutes and not based on an action by an injured employee against an employer. Thus, the court held that the exclusivity provision in Georgia's workers' compensation law

---

[8]The Horseshoe argues that *Swengel-Robbins* was distinguished in Citizens Utilities v. New West Homes, 848 P.2d 308, 311 (Ariz. Ct. App. 1992). According to the Horseshoe, *Citizens Utilities* stands for the proposition that Arizona's overhead power line statutes were designed to protect employees of construction companies, but not employees of all employers. The *Citizens Utilities* court, in dictum, merely noted that the legislature, in passing the overhead power line statutes, intended to protect workers against the risk of electrocution at construction sites. *Id.* at 312. The court did not hold that a power company could seek indemnification solely from a construction employer.

Regardless, NRS 455.240 provides for liability for "[e]ach person who committed the violation [of the overhead power line statutes] or caused another person to commit the violation. . . ." NRS 455.240. Statutes should be interpreted according to their plain meaning whenever possible. McKay v. Bd. of Supervisors, 102 Nev. 644, 648, 730 P.2d 438, 440 (1986). An employer can be a person who "caused another person to commit the violation" under NRS 455.240.

did not prevent a power line owner from seeking indemnity from an employer. *Id.*

Colorado is the only state to hold that a power company does not have a right to indemnification under the state's overhead power line statutes. Rodriquez v. Nurseries, Inc., 815 P.2d 1006, 1008 (Colo. Ct. App. 1991). The *Rodriquez* decision neither cited nor addressed the decisions of the courts of Oklahoma, Arizona, and Texas. The Colorado court determined that if the Colorado legislature had intended the overhead power line statutes to operate as an exception to the exclusivity provision of workers' compensation, "it would have done so clearly." *Id.* The court noted that workers' compensation was not discussed in the legislative history of the overhead power line statutes. *Id.* The court then held that an employer was immune from suit by the power company. *Id.*

Regardless of the holdings, all of the cases recognize that there is an inherent conflict between the plain meaning of the overhead power line statutes and the laws governing employer immunity under workers' compensation statutes. Thus, the courts in Arizona, Colorado and Texas reviewed legislative history in an attempt to resolve this conflict. The Horseshoe argues that there is nothing in the legislative history to suggest that NRS 455.240 was intended to operate as an exception to the exclusivity provision of workers' compensation and urges the court to follow Colorado and the *Rodriquez* holding. Conversely, Nevada Power asserts that the legislature intended the overhead power line statutes to apply to all persons, including employers, regardless of the workers' compensation laws. Thus Nevada Power contends the court should follow the rationale set forth in the Arizona, Oklahoma and Texas cases.

There is no legislative history in Nevada to support either position. The notes of the senate and assembly committee hearings do show that the general purpose of the overhead power line statutes was to prevent injuries to people who work near high voltage power lines. However, the notes are not helpful in determining the purpose behind the liability and fee portions of the statutes. While couched by the proponents of the legislation as a workers' safety issue, members of the assembly questioned whether, given the civil penalties, the sections involving fees and liability were really necessary to address the safety concerns. Hearing on S.B. 400 Before the Assembly Health and Human Services Committee, 67th Leg. (Nev., June 1, 1993).

Finally, there is no mention of workers' compensation issues in the record of the hearings. Thus, the legislative history cannot resolve whether the legislature intended the statutes to operate as an exception to workers' compensation immunity provisions. As

the actual history is of little help in determining the legislature's intent, we must turn to standard rules of statutory construction to resolve the issue.

"[I]t is an accepted rule of statutory construction that a provision which specifically applies to a given situation will take precedence over one that applies only generally." Sierra Life Ins. Co. v. Rottman, 95 Nev. 654, 656, 601 P.2d 56, 57-58 (1979) (citing W.R. Co. v. City of Reno, 63 Nev. 330, 172 P.2d 158 (1946)). The overhead power line statutes were specifically enacted to protect all persons from the hazards associated with working in close proximity to high voltage overhead power lines. The NIIA, on the other hand, provides a general method for workers to be compensated for work-related injuries without the necessity of suing their employers and proving negligence. *See* American Federal Savings v. Washoe County, 106 Nev. 869, 875, 802 P.2d 1270, 1275 (1990) ("[T]he overall structure and policy of the NIIA indicates the Act's purpose to regulate the rights and obligations running between an *employer and an employee,* as opposed to the rights and obligations running between an *employer and a third-party.* "). Moreover, while the NIIA is generally concerned with worker health, it is not primarily a worker safety statutory scheme.

In addition, the overhead power line statutes were passed after the establishment of employer immunity under workers' compensation laws. When the legislature enacts a statute, this court presumes that it does so "with full knowledge of existing statutes relating to the same subject." City of Boulder v. General Sales Drivers, 101 Nev. 117, 118-19, 694 P.2d 498, 500 (1985). While the power line and workers' compensation statutes do not involve the same subject, they have sufficient similarities to warrant consideration of this rule. We agree with the *Olson* court's rationale and conclude that NRS 455.240 should take precedence over NRS 616B.612. Olson v. Central Power and Light Co., 803 S.W.2d 808 (Tex. Ct. App. 1991).

Our holding is also consistent with several other rules of statutory construction. For example, whenever possible, a court will interpret a rule or statute in harmony with other rules or statutes. Bowyer v. Taack, 107 Nev. 625, 627, 817 P.2d 1176, 1177 (1991); City Council of Reno v. Reno Newspapers, 105 Nev. 886, 892, 784 P.2d 974, 978 (1989). In addition, statutory interpretation should avoid absurd or unreasonable results. General Motors

v. Jackson, 111 Nev. 1026, 1029, 900 P.2d 345, 348 (1995); Las Vegas Sun v. District Court, 104 Nev. 508, 511, 761 P.2d 849, 851 (1988); Sheriff v. Smith, 91 Nev. 729, 733, 542 P.2d 440, 443 (1975).

The people who are most likely to be injured around an overhead power line are individuals who are working in the scope of their employment. If employers cannot be sued in indemnification pursuant to NRS 455.240(3) for injuries sustained by their employees, an important incentive for compliance involving the major beneficiaries of the act would be eliminated. Thus, this interpretation would yield an unreasonable result. Finding that NRS 455.240 constitutes an exception to the employer immunity provision fully promotes the purpose of the overhead power line statutes with minimal interference with the general purpose of the workers' compensation laws. This is a more harmonious resolution of the conflict between the two statutes than gutting the power line statute in favor of the workers' compensation laws.

III. *Definition of Overhead Power Line*

Having determined that NRS 455.240(3) creates an exception to employer immunity under workers' compensation statutes, we turn to the applicability of that statute to power lines attached to transformers located inside a building.[9] NRS 455.200(2) provides that:

> "Overhead line" means a bare or insulated electrical conductor installed above ground.

An electrical conductor is any device which channels electricity. *See Random House Dictionary* 426 (2d Edition 1993). The transformers and wiring touched by Haggerty were electrical conductors. The issue, then, is whether transformers installed in the basement of a building to provide power to that building are

---

[9]This issue was not litigated in the district court. Normally an issue not raised below cannot be raised for the first time on appeal. Montesano v. Donrey Media Group, 99 Nev. 644, 650 n.5, 668 P.2d 1081, 1085 n.5 (1983). This argument was presented to the court in the amicus curiae brief filed by the Association. As the interpretation of the statute is solely a question of law, rather than requiring the Horseshoe to raise the issue in the district court in a summary judgment motion, in the interests of judicial economy, we have chosen to address the matter at this time. It is not disputed that the Horseshoe failed to inform Nevada Power, pursuant to NRS 455.220 and 455.230, that Haggerty would be working in close proximity to high voltage equipment. It is also undisputed that Nevada Power owned the transformers in the vault and was aware that Horseshoe employees would be coming into the room where the vault was located.

"installed above ground" and within the scope of an "overhead line."

The Association argues that the term "above ground," together with the words "overhead line," means electrical conductors that are in the air. Overhead should be given its ordinary, everyday meaning: "over one's head; aloft; up in the air or sky." *See Webster's New Universal Unabridged Dictionary* 1382 (1996). Transformers sitting on a platform of a finished floor inside a building are not up in the air or sky and are not "overhead." Finally, even if a transformer housed within a building, but on a platform, might be overhead, if that transformer is located in a basement, below the street level grade, *i.e.*, underground, then it cannot be overhead within the meaning of the statute.

Nevada Power contends that the term "above ground" means unburied. Thus, any conductor not covered by soil is above the ground. The transformers in question were placed on a shelf above the finished floor of the basement and over Haggerty's head. According to Nevada Power, they were therefore "above ground," "overhead" lines under NRS 455.200(2).

■■■ ■ ■

"When the language of a statute is plain and unambiguous, a court should give that language its ordinary meaning and not go beyond it." *Reno Newspapers*, 105 Nev. at 891, 784 P.2d at 977. However, if a statute is susceptible to more than one natural or honest interpretation, it is ambiguous. *See* Randono v. CUNA Mutual Ins. Group, 106 Nev. 371, 374, 793 P.2d 1324, 1326 (1990).

■■■ ■

The fact that the dissent views the term "above ground" differently than the majority is ample evidence that reasonable minds can disagree over the definition of "overhead line" in the context of this statute. When a statute is ambiguous, it should be construed " 'in line with what reason and public policy would indicate the legislature intended.' " Robert E. v. Justice Court, 99 Nev. 443, 445, 664 P.2d 957, 959 (1983) (quoting Cannon v. Taylor, 87 Nev. 285, 288, 486 P.2d 493, 495 (1971)).

■■■ ■■

Several factors can be used to determine legislative intent. The title of a statute can be considered. *See* A Minor v. Clark Co. Juvenile Ct. Servs., 87 Nev. 544, 548, 490 P.2d 1248, 1250 (1971). Other words or phrases used in the statute or separate subsections of the statute can be reviewed to determine the meaning and purpose of the statute. Bd. of County Comm'rs v. CMC of Nevada, 99 Nev. 739, 744, 670 P.2d 102, 105 (1983). Finally, the

subject matter of the statute and the policy to be effectuated can be used in statutory construction. *Welfare Div. v. Washoe Co. Welfare Dep't.*, 88 Nev. 635, 503 P.2d 457 (1972).

The act in question, NRS 455.200–NRS 455.250, is entitled "Overhead Lines Carrying High Voltage." This language presents an image of an outdoor, unenclosed electrical line. Other sections of the statute also seem more consistent with outdoor, unenclosed electrical equipment. For example, NRS 455.210(2) provides that the statute, under certain circumstances, is not applicable to an employee of a cable antenna or communication services system if the employee is making attachments to "the structure supporting an overhead line carrying high voltage." Finally, NRS 455.230(3) states that if a "structure on which the person is performing the work" was already in existence when the public utility installed the overhead line, then the fees required by the statute are waived. None of the above language is dispositive of the issue, but it all suggests that the statute covers outdoor, not indoor, electrical equipment.

Another factor supporting this conclusion is the use of the words "above" and "ground" rather than the adjective "aboveground." *Webster's New Universal Unabridged Dictionary* (1996). Above means "overhead, upstairs, or in the sky." Ground refers to the "solid surface of the earth." Thus, "aboveground" would be over the surface of the earth, not on the surface. "Aboveground," however, is defined as "situated above or on the ground."

The comments and questions made by members of the legislature during the hearings provide some insight into the purpose of the statute. References are made to "crane operators" and "people working under" power lines. Hearing on S.B. 400 Before the Assembly Health and Human Services Comm., 67th Leg. (Nev., June 1, 1993). Again, this suggests the purpose was to protect people working in outdoor areas who might come into contact with power lines, rather than electrical equipment which a utility company maintains in the basement of a large building.

Finally, we need to examine whether the purpose of the statute would be frustrated if the statute were not applied to this type of indoor electrical equipment. The statute was designed to address two issues: (1) the safety of people working near high voltage overhead power lines and (2) the protection of public utility property. It addresses these issues by requiring people to contact the utility when they are performing work in close proximity to an overhead electrical line. The statute does not require such notice for all types of electrical equipment. In addition, the notice is required because the public utility cannot monitor all of its vari-

ous installations and lines or completely isolate these lines from surrounding structures and activity.

In this instance, the electrical conductors, the transformers and the cables leading to and from them were maintained by Nevada Power in a closed off portion of a room in the basement of a large building. Major buildings have such on-site transformers. Nevada Power had the ability to control access to the area and to enter into a written express indemnity agreement with the owners of the building. Nevada Power already knew the maintenance staff of the building might be working in proximity to the equipment and could take permanent steps to prevent accidental contact. Indeed, in this case, such steps were taken, since the vault containing the transformers was supposed to be padlocked.

If the overhead power line statutes were construed to apply in this situation, then each time a Horseshoe employee conducted work in the electrical room of the building, the Horseshoe might be required to contact Nevada Power, whether or not the employee was actually working in the vault where the high voltage power lines are located, because the proximity of the room and the vault could come within the parameters of the statute. Under the statute, Nevada Power could also charge a fee for supervising the work to ensure no one came into contact with the high voltage equipment. Given the number of times this would occur on a weekly basis, it is unlikely that the legislature intended such a result, since the employees could more easily be protected by Nevada Power restricting access to its equipment. Indeed, applying NRS 455.240 to Nevada Power's indoor equipment would be more likely to undermine worker safety, since there would be no incentive for Nevada Power to maintain safety measures to protect people and property from accidental contact where Nevada Power knew such contact was likely to occur. The statutory intent is better served by not imposing the provisions of the overhead power line laws to high voltage electrical equipment located within a building.

## CONCLUSION

The provisions of NRS 455.200–NRS 455.250 apply to an employer, whose employee is injured by contact with an overhead power line, when the employer fails to notify the appropriate public utility before allowing the employee to work in close proximity to high voltage power lines in violation of the statute. Indoor high voltage power lines owned by a public utility are not within the definition of ''overhead line'' as provided by NRS 455.200.

Accordingly, we affirm the district court's order dismissing Nevada Power's third-party complaint against the Horseshoe.[10, 11]

ROSE, C. J., and YOUNG, J., concur.

SHEARING, J., concurring:

I agree that the judgment denying indemnification to Nevada Power Company should be affirmed on the basis of the language in NRS 455.200. The legislature defined the term "overhead line" as "a bare or insulated electrical conductor installed above ground." NRS 455.200(2). The dissent may have persuasive policy arguments in favor of including high voltage transformer equipment located in a basement of a building within the definition of "overhead line." However, the legislature did not make such an inclusion, and therefore this court has no business holding otherwise.

AGOSTI, J., with whom LEAVITT, J., agrees, dissenting:

I respectfully dissent. I would reverse the district court's order and remand the matter for trial.

Initially, I note that the majority has determined that Raymond Haggerty's injuries were not caused by contact with an overhead line within the meaning of NRS 455.200(2). It should stop there. Its conclusion that the overhead power line statutes create an independent duty to indemnify need not and should not be reached if the circumstances of this case do not bring it within the parameters of the overhead power line statutes. As stated in City of North Las Vegas v. Cluff, 85 Nev. 200, 201, 452 P.2d 461, 462 (1969), "[t]his court is confined to controversies in the true sense. The parties must be adverse and the issues ripe for determination."

I also note that the issue of whether the power lines located in the Horseshoe Club's basement are "overhead line[s]" within the meaning of NRS 455.200(2) was never raised in the district court. This issue was first raised on appeal in an amicus curiae brief filed by the Nevada Self-Insurers Association. For this reason, I believe that this court should not consider this issue at this time.

---

[10]Nothing in this opinion is intended to bar Nevada Power from pursuing any other claim against the Horseshoe based upon an allegation that the Horseshoe had an independent duty to Nevada Power which would constitute an exception to employer liability under the workers' compensation statute. The record on appeal, for example, does not indicate what agreement, if any, existed between Horseshoe and Nevada Power with respect to securing the vault, maintaining warning signs or access to the vault by the Horseshoe employees.

[11]THE HONORABLE A. WILLIAM MAUPIN, Justice, voluntarily recused himself from participation in the decision of this appeal.

*See* Diamond Enterprises, Inc. v. Lau, 113 Nev. 1376, 1378, 951 P.2d 73, 74 (1997) (''It is well established that arguments raised for the first time on appeal need not be considered by this court.'').

While I agree with the majority that NRS 455.240 permits indemnification if the provisions of NRS 455.230 are violated, I dissent because I believe that the electrical equipment which caused Haggerty's injuries does fit within the definition of an overhead power line.

I agree with the majority that the term ''above ground'' is subject to a variety of interpretations. I disagree that in the context of the statute in question, ''above ground'' excludes a basement. A worker standing in a basement is certainly standing above the ground below his feet. And the power line located near the roof of a room in a basement is certainly overhead in the sense that it is above the worker. I also believe that nothing in the language of NRS 455.200(2)[1] compels the conclusion that the line must be in the open air, outside or above sea level. The simplest and best interpretation of this statute is that ''above ground'' means not buried.

An important purpose of the overhead power line statutes is to promote worker safety. This purpose is best accomplished if an employer is provided with an economic incentive to notify the applicable utility whenever an employee must work within close proximity to a power line maintained by the utility.

This court has consistently determined that a statute with a protective purpose should be liberally construed in order to effectuate the intended protection. For example, in Tobin v. Gartiez, 44 Nev. 179, 191 P. 1063 (1920), this court interpreted a statute which prohibited unauthorized grazing on the land of a person with ''legal title.'' *Id.* at 186-87, 191 P. at 1065. This court determined that ''legal title'' included a lessee because the statute was enacted to protect those with a right to the exclusive occupation of the land. *Id.*

This court interpreted a mining statute in Ex Parte Douglass, 53 Nev. 188, 295 P. 447 (1931). In *Douglass,* this court held that a statute which required mine shafts to be equipped with a ''safety cage, safety crosshead or safety skip'' required a safety cage and either a safety crosshead *or* safety skip, rather than reading the statute as providing three alternatives, because the statute was enacted to promote the safety of miners as they traveled up and down mine shafts. *Id.* at 191-92, 295 P. at 448 (quoting Section

---

[1] '' 'Overhead line' means a bare or insulated electrical conductor installed above ground.''

10480, N.C.L as amended (1913 Nev. Stat., ch. 267, § 1, at 422-23)).

More recently, this court interpreted a real estate licensing statute in Brill v. State Real Estate Division, 95 Nev. 917, 604 P.2d 113 (1979). In *Brill,* the issue was whether a twenty-five dollar fee charged by the defendant for access to an index of available homes for sale and rent was an "advance fee," thus mandating that the defendant obtain a real estate license. This court determined that the fee was in fact an "advance fee," because the purpose of the real estate license statute was to protect the public from unqualified persons. *Id.* at 919-20, 604 P.2d at 114.

A few years later, this court decided Colello v. Administrator, Real Estate Div., 100 Nev. 344, 683 P.2d 15 (1984). In *Colello,* the appellants received a judgment against a real estate licensee on the basis of fraud, misrepresentation and embezzlement. After appellants unsuccessfully attempted to collect from the licensee, they obtained $10,000.00 from the Real Estate Education, Research and Recovery Fund ("Fund") pursuant to Nevada law. This court held that appellants were only required to assign $10,000.00 of their judgment to the Fund despite statutory language that "the judgment creditor shall assign all his right, title and interest in the judgment" because the statute was intended to protect judgment creditors without requiring them to forsake their entire judgment to collect a portion. *Id.* at 346 n.2 and 347-48, 683 P.2d at 16 n.2 and 16-17 (emphasis added) (NRS 645.8491 quoted in footnote 2).

I believe that Nevada's overhead power line statutes should be liberally construed as were the statutes in the noted cases. I believe a liberal construction is all the more compelling when the protective purpose of a statute involves physical safety. As previously stated, the purpose of the statutes in question here is to promote worker safety. The legislature determined it could best do so if it provided an incentive for an employer to report work conducted in proximity to power lines. Neither the statute nor the legislative history distinguishes between outdoor and indoor power lines. The danger posed to an employee is certainly not reduced if the power line is located indoors, as demonstrated by what happened to Haggerty. I believe that the purpose of the overhead power line statutes would be best accomplished if the statutes were interpreted to apply to *all* exposed power lines, without regard to whether they are located outside or inside, on a wooden pole or in a basement.

Finally, the majority bases its decision, in part, on the concern that a ruling for Nevada Power would mean that Nevada Power

might charge repeated supervisory fees to the Horseshoe Club whenever an employee works near the electrical room. Nothing exists in the record to support this assertion. This court "has no power to look outside of the record of a case." Carson Ready Mix v. First Nat'l Bank, 97 Nev. 474, 476, 635 P.2d 276, 277 (1981) (quoting Alderson v. Gilmore, 13 Nev. 84, 85 (1878)).

For all of the above reasons, I would reverse the order of the district court and remand this matter for trial.